IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AMONI NEUIFI; SIOSAIA NAETA; TRÉ JAMES; LEE COSBY; MONDARIOUS BENSON,<br><br>Plaintiff,<br><br>v.<br><br>SNOW GARDEN APARTMENTS; ANTHONY WILLIAM DAVIS,<br><br>Defendant. | **MEMORANDUM DECISION & ORDER**<br><br><br>Case No. 2:12-CV-00774<br><br>Judge Robert J. Shelby |

This case arises out of allegations of discriminatory housing practices in a small college town.  While attending Snow College in Ephraim, Utah, Plaintiffs inquired about the possibility of housing at Snow Garden Apartments.  Although the parties describe the events that followed in different ways, Plaintiffs never obtained housing at the apartment complex.  Believing that its employees and manager discriminated against them based on race, Plaintiffs sued Snow Garden Apartments and its owner, Anthony William Davis, alleging violations of federal housing laws.

Plaintiffs and Defendants filed cross-motions for summary judgment on liability.  After careful consideration and for the reasons stated below, the court denies both motions.

**BACKGROUND**

### I.     THE SNOW GARDEN APARTMENTS

Snow Garden[1] operates an apartment complex in Ephraim, Utah.  The complex contains six-bed shared apartments.  Although the exact number varies from year to year, Snow Garden rents space to up to 294 students attending Snow College in the fall and spring semesters.  Snow Garden rents to both groups and individuals.  Availability varies widely throughout any given school year.  There may be times when individual housing is available at Snow Garden, even though group housing is unavailable because open beds are located in different apartments.  In the summer, Snow Garden may use some of its apartments for short-term events, such as family reunions, sport camps, or youth events.[2]

#### A.     Polynesian Plaintiffs

Plaintiffs Amoni Neuifi and Siosaia Naeta are Polynesian.  In April 2010, Mr. Neuifi visited the Snow Garden Apartments (the Apartments) to ask whether there was any space available for himself, and if possible, either three or five of his friends for Fall Semester 2010.[3] Mr. Neuifi testified that he was told the apartment complex was full, but that he could complete an online application, pay a fee, and wait for Snow Garden to contact him if a space became available.[4]  Mr. Neuifi did not go online to review or complete the application.[5]  He could not state whether the online application required payment of the fee prior to submission of the

_____

[1] The court will refer to Snow Garden Apartments and Anthony William Davis collectively as "Snow Garden."

[2] Dkt. No. 51-1.

[3] *Compare* Dkt. No. 52-2, at 8, 11, *with* Dkt. No. 46-8, at 1.

[4] *Id.* at 9.

[5] *Id.* at 9.

2

application.[6]  When he visited again later that year, he learned that Snow Garden had vacancies, which caused him to believe that Snow Garden lied to him.[7]

In April 2011, Mr. Neuifi returned to the Apartments to inquire about housing with his cousin, Mr. Naeta.[8]  Mr. Neuifi and Mr. Naeta expressed an interest in renting housing at the Apartments.[9]  During his deposition, Mr. Neuifi testified that he sought an entire six-bed apartment for the summer and 2011-2012 Academic Year.[10]  But in affidavits prepared shortly after the encounter with Snow Garden, Mr. Neuifi and Mr. Naeta testified that they sought housing for three individuals for Fall Semester 2011.[11]  Mr. Neuifi testified that Snow Garden's employee instructed them to complete an online application, pay the fee, and that Snow Garden would then "let you know."[12]  Mr. Naeta testified this employee provided a packet, instructed the students to complete an online application, and wait for an opening.[13]  Both Mr. Neuifi and Mr. Naeta testified that Snow Garden indicated its apartments were full.[14]  Neither Mr. Neuifi nor Mr. Naeta went online to review or complete the online application.[15]

---

[6] Later that year, Mr. Neiufi's friend, who lived at Snow Garden, informed him that there was space available for rent.  Dkt. No. 46-1, at 21; Dkt. No. 44-8, at 1.  Mr. Neuifi did not apply because he had already found a place to live and had been told that Snow Garden was full.  Dkt. No. 46-1, at 22; Dkt. No. 44-8, at 1.

[7] Dkt. No. 46-8, at 1.

[8] Dkt. No. 46-1, at 28.

[9] *Id.* at 28-29.

[10] Dkt. No. 46-1, at 28-29.

[11] Dkt. No. 47-8, at 1, 3.

[12] *Id.* at 33-34.

[13] Dkt. No. 40-2, at 20.

[14] Dkt. No. 46-1, at 33-34; Dkt. No. 40-2, at 20.

[15] *Id.*

Suspecting that Snow Garden was discriminating against Polynesian students, Mr. Neuifi and Mr. Naeta asked one of their friends to visit the Apartments to inquire about housing.[16] Three friends—John Snyder, Reese Knutson, and Aaron Zimmerman—who describe themselves as "Caucasian or white" visited Snow Garden approximately fifteen minutes after Mr. Neuifi and Mr. Naeta left the apartment complex.[17] Mr. Snyder asked the manager whether there was an apartment available during the fall semester for the three of them and possibly two other individuals.[18] The manager purportedly responded that Snow Garden could place the three friends in the same apartment but that she may need to place the other two in a nearby complex. The following Monday, the manager contacted Mr. Snyder to inform him that she could place all five applicants in the same apartment. According to the Caucasian students, the manager did not require a deposit or completion of an online application.[19]

## B.  African American Plaintiffs

In spring 2012, Tre James, Lee Crosby, Mondarious Benson, and Brian Cobbs visited the Apartments to inquire about the possibility of housing during the 2012-13 Academic Year. Each of the students self-identifies as African American.[20] They spoke with a Snow Garden manager, who said she was 99-percent certain that the apartment complex was full.[21] The manager instructed the students to go online to complete an application. Mr. James did not inquire about Snow Garden's specific application process. Mr. James and Mr. Crosby took an application packet. Mr. Crosby testified the group was told to submit their deposit with the application.

---

[16] Dkt. No. 46-8.

[17] Dkt. No. 46-9, at 1.

[18] *Id.*

[19] *Id.*

[20] Dkt. No. 40-3, at 8; Dkt. No. 40-4, at 4.

[21] Dkt. No. 40-3, at 10; Dkt. No. 44-4, at 8.

The students never went online to view the online application.  Mr. James, Mr. Cosby, and Mr. Benson did not fill out the online application because the application packet indicated that a $250 security deposit was required as part of the application and because the Snow Garden manager was almost certain that the Apartment was full.[22]

In April 2012, Mr. James returned to the Apartments with Damond Powell.[23]  Mr. James and Mr. Powell approached a Snow Garden employee and asked about the possibility of applying for housing at the Apartments.[24]  According to Mr. James, the employee responded that she was 99-percent certain that the apartment complex was full but that she informed the students that they could complete an application.[25]  Although he accepted an application from the complex, Mr. James testified that his application was never formally submitted to Snow Garden because it required a security deposit and the employee was 99-percent certain that the apartment complex was full.[26]  Mr. James testified that he was devastated and hurt because he felt that his group of friends had been judged because of "the color of our skin, our race."[27]

### C.    Disputed Factual Issues

The parties dispute Snow Garden's application process.  Ashley Jensen, the manager of Snow Garden, submitted a declaration denying that a fee or deposit was required prior to the submission of an initial application.[28]  She testified that spring semester is difficult because she attempts to give current tenants the option of remaining in their apartments but many tenants

---

[22] Dkt. No. 40-3, at 11.

[23] *Id.* at 14.

[24] *Id.* at 15.

[25] *Id.* at 15.

[26] *Id.* at 16.

[27] Dkt. No. 41-3, at 16.

[28] Dkt. No. 51-1, at 1.

delay making a decision.[29]  She also testified Snow Garden rents to groups and individuals, and she believes that she truthfully informs applicants about housing availability, including when individual housing may be available but a group arrangement is not possible.[30]  Ms. Jensen testified she follows the same application process with all potential tenants,[31] and that she never commits to a rental until she receives an application, deposit, and signed lease agreement.[32]

Plaintiffs, however, describe personal experiences that differ starkly from Ms. Jensen's description of the application process.[33]  According to Plaintiffs, incomplete internal documents obtained during discovery reveal that housing remained available at the Apartments, at least for some of the time periods about which Plaintiff inquired.[34]  Plaintiffs also submit Snow Garden documents that suggest a $250 deposit, some of which may have been nonrefundable, was due at the time of the application.[35]  Snow Garden's internal documents and deposition testimony suggest that every applicant is required to submit a personal photograph as part of the application process.[36]  Finally, although the exact number of students seeking housing may have differed, Plaintiffs maintain that Snow Garden offered a group of Caucasian students housing shortly after the Polynesian Plaintiffs visited Snow Garden in 2011, without first requiring the Caucasian students to complete the online application or make a deposit.

---

[29] *Id.* at 3.

[30] *Id.* at 3.

[31] Dkt. No. 58-4, at 9-18.

[32] Dkt. No. 51-1, at 4.

[33] *See supra* Background, Parts A, B.

[34] Dkt. No. 44-5, at 27-29.

[35] *See, e.g.*, Dkt. No. 44-5, at 21-30.

[36] *See, e.g.*, *id.* at 6, 9, 22.

The parties dispute the availability of summer student housing.  Snow Garden contends it does not rent to students during the summer months and this has been its policy for the past five years.[37]  For this reason, Snow Garden maintains it did not provide inaccurate information when Mr. Neuifi inquired about renting an apartment for the summer and 2010-2011 Academic Year.  In contrast, citing Snow Garden's website, Plaintiffs argue that Snow Garden made apartments available to students during the summer months.[38]

The parties dispute whether Ms. Jensen made discriminatory statements to a former Snow Garden employee, Janessa Christensen.  Plaintiffs submit a transcript of a surreptitious recording, in which Ms. Christensen purportedly informs a competitor that Ms. Jensen would not rent to Polynesian or African American students.  Ms. Christensen apparently also divulged that Ms. Jensen believed that Polynesian students would not pay their rent.[39]  Ms. Jensen testified that she never made the statements relating to African American or Polynesian students, and that it has never been Snow Garden's policy to consider race in the context of rental applications.[40]  Ms. Jensen also testified that she has never knowingly given false information about housing availability.[41]

The parties also dispute the availability of housing during the time periods about which Plaintiffs inquired.  According to Ms. Jensen, housing availability changes from year to year, but empty spots remained minimal.  Ms. Jensen testified that all of the housing opportunities were filled during the 2010-2011 and 2011-2012 Academic Years, and that there were only six empty

---

[37] Dkt. No. 51-1, at 1.  Ms. Jensen testified the information on the website was out of date and inaccurate.

[38] Dkt No. 44-7, at 2 (containing a screenshot from September 27, 2013).  An undated housing application lists summer as a rental option.  *See* Dkt. No. 46-5, at 21.

[39] Dkt. No. 44-6, at 8-9.

[40] Dkt. No. 51-1, at 1.

[41] *Id.* at 2-3.

spots during the 2012-2013 Academic Year.[42]  In contrast, Plaintiffs point to internal Snow

Garden documents obtained in discovery, the experience of the Caucasian applicants, and the

statements of a resident, all of which suggests that housing may have been available at the time

when the African American or Polynesian Plaintiffs approached Snow Garden to rent housing.

## ANALYSIS

### II.    Applicable Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."[43]  "A material fact is one

that might affect the outcome of the suit under the governing law, and a genuine issue is one for

which the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."[44]  When evaluating a motion for summary judgment, the court must "view the evidence

and make all reasonable inferences in the light most favorable to the nonmoving party."[45]

"When the moving party does not have the ultimate burden of persuasion at trial, it has

both the initial burden of production on a motion for summary judgment and the burden of

establishing that summary judgment is appropriate as a matter of law."[46]  This initial burden may

be satisfied "either by producing affirmative evidence negating an essential element of the

nonmoving party's claim, or by showing that the nonmoving party does not have enough

evidence to carry its burden of persuasion at trial."[47]

---

[42] *Id.* at 3.

[43] Fed. R. Civ. P. 56(a).

[44] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citation omitted).

[45] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[46] *Pelt*, 539 F.3d at 1280 (internal quotation marks and citation omitted).

[47] *Trainor v. Apollo Metal Specialties, Inc*., 318 F.3d 976, 979 (10th Cir. 2002).

### III.     Standing

Snow Garden asserts that summary judgment should be entered in its favor because Plaintiffs did not submit formal applications for housing at the Apartments.  Snow Garden believes this alone deprives Plaintiffs of standing to assert claims under the Fair Housing Act.

In the Tenth Circuit, standing for Fair Housing Act claims extends to the "full limits" of Article III.[48]  Accordingly, to satisfy standing requirements, a plaintiff must show "(1) actual or threatened injury; (2) a causal connection to the conduct complained of; and (3) redressability of the injury by the requested relief."[49]

The Tenth Circuit specifically addressed standing under the Fair Housing Act in *Wilson v. Glenwood Intermountain Properties, Inc.*[50]  In that case, two individuals—Mark Wilson and Anne Walker—brought suit against a group of landlords for owning, operating, and advertising gender-segregated housing for Brigham Young University students.[51]  Mr. Wilson was denied housing in an apartment reserved for women, while Ms. Walker was denied housing in an apartment reserved for men.  Neither Mr. Wilson nor Ms. Walker was married or enrolled as a student at BYU.[52]  The district court entered summary judgment in favor of the landlords, concluding Mr. Wilson and Ms. Walker "failed to establish a prima facie case . . . because, as non-students, they were not otherwise qualified for apartments reserved for students."[53]

---

[48] *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1497 (10th Cir. 1995); *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 593 (10th Cir. 1996) (describing elements at length).

[49] *Bangerter*, 46 F.3d at 1497.

[50] 98 F.3d 590 (10th Cir. 1996).

[51] *Id.* at 592.

[52] *Id.*

[53] *Id.*

On appeal, the Tenth Circuit vacated the judgment and remanded with instructions to dismiss for lack of standing because Mr. Wilson and Ms. Walker "have not shown the required causal relationship or the likelihood that a favorable decision would redress the injury."[54]  The Tenth Circuit recognized that a person "claiming discrimination in the denial of a benefit need not show they would have obtained the benefit in the absence of the discrimination to establish standing; it is enough to show the discrimination deprived them of the ability to compete for the benefit on an equal footing."[55]   At the same time, the court concluded that a person's failure to satisfy "lawful, nondiscriminatory requirements or qualification for the benefit" may deprive that individual of standing, because (a) causation could not be proved where the discrimination itself did not cause the deprivation of the benefit, and (b) redressability was absent where the person would still be disqualified from competing even after receiving a favorable decision.[56]

Applying these principles to the facts there presented, the court held Mr. Wilson and Ms. Walker lacked standing because they would not have been eligible for student housing.  Noting that the Fair Housing Act "does not make it unlawful for landlords to give preference to colleges students over non-students,"[57] the court concluded that non-students seeking relief from gender-segregated housing lacked standing "because even in the absence of the challenged gender discrimination they would not have qualified to rent the student apartments."[58]

---

[54] *Id.* at 593, 597.

[55] *Id.* at 593.

[56] *Id.* at 593.

[57] *Id.* at 593.

[58] *Id.*; *see also Day v. Bond*, 500 F.3d 1127 (10th Cir. 2007) (discussing holding of *Wilson*).

In this case, Defendants argue Plaintiffs lack standing because they failed to submit an application required for all potential renters.[59]  The court, however, concludes that Defendants are not entitled to summary judgment on this basis for four reasons.

First, two of the claims in this case are not dependent on the submission of any formal application.[60]  Defendants only cursorily and unpersuasively address this issue.[61]  But the various sections of the Fair Housing Act are directed at different types of injury.[62]  As discussed below, Plaintiffs provide evidence of cognizable and redressable injuries arising out of Snow Garden's application process and misrepresentations about the availability of housing.  Accordingly, a mere absence of a formal application is not dispositive of standing on these claims.

Second, the decision relied on by Defendants is distinguishable.  In *Wilson*, the applicants could not establish causation or redressability because the applicants were not students and never would have qualified for the housing sought.  As a result, the alleged discrimination could not deprive the applicants "of the ability to compete for the benefit on an equal footing."[63]  In contrast, Plaintiffs' theory in this case is that Defendants discriminated against Polynesian and African American students by using inaccurate information to discourage students from submitting a formal application in the first instance.  Unlike in *Wilson*, Defendants here do not dispute that Plaintiffs were qualified to submit a formal application and obtain housing.  Instead, Plaintiffs allege they could have obtained housing but for Snow Garden's discriminatory

---

[59] Dkt. No. 40, at 7.

[60] 42 U.S.C. § 3604(b), (d).

[61] Defendants briefly argue that the application issue is intertwined with each of the claims.  The issue was not adequately briefed.  But even if it were, this approach appears to have been foreclosed by the Tenth Circuit.  *See Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 595 (10th Cir. 1996) (distinguishing between claims arising under different sections of the Fair Housing Act).

[62] *Infra* Part VI.

[63] *Wilson*, 98 F.3d at 593.

conduct, which erected barriers to participating in the application process.  In this respect,

Plaintiffs suffered an injury fairly traceable to Snow Garden's discriminatory conduct that would

likely be redressed by a favorable decision.  As a result, Plaintiffs have standing under Article III.

Third, even if *Wilson* should be extended to the facts of this case, the court finds that

genuine issues of material fact preclude summary judgment.  In this case, Plaintiffs believed that

their inquiries constituted the first step in Snow Garden's application process.  And although Ms.

Jensen testified that she provided accurate information to all applicants, followed the exact same

application procedure, and did not commit to a rental until after receiving an application, deposit,

and a signed lease, the experience of Mr. Snyder and his friends suggests otherwise.  Because of

these inconsistencies, a reasonable juror could conclude that it was Snow Garden's

discriminatory application process—rather than the online application itself—that caused an

injury that could be redressed only through a suit under the Fair Housing Act.

For all of these reasons, the court concludes that Plaintiffs present sufficient evidence to

demonstrate standing under Article III.

## IV.   Direct Discrimination

Citing an Eleventh Circuit decision, Plaintiffs maintain that summary judgment should be

granted in their favor, arguing that a recorded conversation between a former employee of Snow

Garden and a competitor provides direct evidence of discriminatory housing practices.

The court disagrees.  Even assuming that the transcript of the recorded conversation is

competent evidence, Snow Garden's manager submitted an affidavit denying the statements.[64]

---

[64] Plaintiffs argue that Ms. Jensen's affidavit is a sham.  Dkt. No. 59, at 2 (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).  After careful review of the exhibits and affidavit, the court declines to apply the "sham-affidavit" rule.  Ms. Jensen does not appear to have been cross-examined, and her deposition left open several questions, which the affidavit does not clearly contradict.  For example, Ms. Jensen's deposition did not address the possibility that Snow Garden reserved space for current tenants.  And in fact, the

At this stage of the proceeding, this court is instructed to look at the record in its entirety when determining whether an issue of fact precludes summary judgment.[65]  Here, Ms. Jensen's statements, as well as the question of whether Snow Garden had adopted a policy of refusing to rent to African American or Polynesian students, present material and disputed factual issues that fall squarely within the province of a jury.  This is a subject suitable for cross-examination, not summary judgment.  For this reason, the court cannot grant summary judgment based upon the purported direct evidence proffered by Plaintiffs.[66]

To the extent Plaintiffs' direct evidence theory invites the court to draw an inference from the experiences of minority applicants,[67] the court concludes that its analysis should be guided by the traditional *McDonnell Douglas* burden-shifting framework, as outlined below.

## V.   MCDONNELL DOUGLAS FRAMEWORK

Courts in the Tenth Circuit apply the three-part test developed in *McDonnell Douglas Corp. v. Green*[68] to claims arising under the Fair Housing Act and § 1982.[69]  Under this burden-shifting framework, the plaintiff initially must present sufficient evidence of a prima facie case of

---

deposition exhibit was neither used by Ms. Jensen nor contained all of Snow Garden's data, some of which appears to have been lost.  Similarly, it is not clearly contradictory for Ms. Jensen to struggle to remember interactions with every prospective tenant, while at the same time testify that she would not knowingly provide false information about availability or the application process.  In sum, while there may be tension between the documents and affidavit, an overly technical reading of Ms. Jensen's deposition is not an appropriate mechanism for resolving the affidavit's veracity or her credibility.  The proper place to resolve such ambiguity is before a jury.  *Cf. Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

[65] Plaintiffs also argue that Ms. Jensen's affidavit was impermissibly attached to Snow Garden's reply memorandum and should be disregarded.  Dkt. No. 55, at 2-3.  The court rejects this argument in light of the fact that Snow Garden should be permitted to respond to arguments raised in opposition to its motion.  Furthermore, this court has an obligation to evaluate the record in its entirety—here, an identical affidavit was submitted with Snow Garden's opposition to Plaintiffs' Motion for Partial Summary Judgment.  *See* Dkt. Nos. 56, 58-5.

[66] Fed. R. Civ. P. 56(a).

[67] *See, e.g.*, Dkt. No. 45, at 16-17; *see also Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012).

[68] 411 U.S. 792 (1973).

[69] *Reynolds v. Quarter Circle Ranch, Inc.*, 280 F. Supp. 2d 1235, 1241 (D. Colo. 2003) (citing *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989)).

discrimination.[70]  Once the plaintiff has done so, the burden shifts to the defendant to produce

evidence that the alleged discriminatory housing activities were "motivated by legitimate, non-

racial considerations."[71]  If the defendant proffers evidence of nondiscriminatory reasons, "the

burden shifts back to plaintiff to show that the proffered reasons were pretextual."[72]

**VI.    PRIMA FACIE SHOWING OF DISCRIMINATION**

"Under the *McDonnell Douglas* analysis, plaintiff first must come forward with proof of

a prima facie case of discrimination."[73]  Although the ultimate burden of persuasion always rests

with the plaintiff, courts characterize this initial prima facie burden as one of production.[74]  In

this case, the parties dispute whether Plaintiffs made a prima facie showing of discrimination for

the four claims asserted.  The court will consider each claim in turn.

**A.    42 U.S.C. §§ 1982, 3604(a)**

Under the Federal Housing Act, it is "unlawful . . . [t]o refuse to sell or rent after the

making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make

unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status,

or national origin."[75]  In the Tenth Circuit, the prima facie elements of a claim arising under §

3604(a) and a claim under 42 U.S.C. § 1982 are the same.[76]

---

[70] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[71] *Asbury*, 866 F.2d at 1279.

[72] *Id.*

[73] *Id.*

[74] *See, e.g.*, *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010); *Elsatel v. Maverik, Inc.*, No. 2:10-CV-989-DS, 2012 WL 399253, at *1 (D. Utah Feb. 7, 2012); *cf. Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097, 2106 (2000) (observing credibility determinations are inappropriate).

[75] 42 U.S.C. § 3604(a).

[76] *Caddy v. J.P. Morgan Chase Bank*, 237 F. App'x 343, 346 n.3 (10th Cir. 2007); *see also Asbury*, 866 F.2d at 1279.

To meet their prima facie burden, Plaintiffs must show the following: (1) they belong to a protected class; (2) they applied and were qualified for the apartment in question; (3) Snow Garden either refused to rent to Plaintiffs or denied them the opportunity to rent, inspect, or negotiate the rental; and (4) the housing opportunity remained available.[77]

At this stage of the case, the first or fourth elements are not in dispute.  Instead, Snow Garden maintains that Plaintiffs cannot satisfy the second and third elements.[78]  For the reasons below, the court concludes that Plaintiffs satisfied their prima facie burden.

The Tenth Circuit's decision in *Asbury v. Brougham* helpfully illustrates a plaintiff's prima facie burden.  In that case, the plaintiff satisfied her prima facie burden by presenting evidence that she informed an apartment manager of her need for housing, but the manager responded that the apartment had no vacancies, invited the plaintiff to call back at a later date, and refused to give the plaintiff an application.[79]  The court contrasted plaintiff's experience to that of her sister-in-law, who did not fall within a protected group but was invited to inspect the apartments, informed that housing was available, and given an opportunity to reserve housing until the following week.[80]  Notably, even though the plaintiff never completed a formal application, the Tenth Circuit held that a reasonable jury could conclude that the defendant failed or refused to provide the plaintiff "the opportunity to rent or inspect or negotiate for the rental of a townhouse or apartment [which in turn] constituted a rejection because of her race."[81]

---

[77] *Asbury*, 866 F.2d at 1279; *see also Khalil v. Farash Corp.*, 260 F. Supp. 2d 582, 588 (W.D.N.Y. 2003) ("[To demonstrate a prima facie case,] plaintiffs must show that (1) they are members of a class protected by the FHA; (2) they sought, and were qualified, to rent . . . the dwellings in question; (3) defendants refused to rent to plaintiffs; and (4) the housing was put on the market or was rented to other tenants.").

[78] Dkt. No. 58, at 4-7.

[79] *Asbury*, 866 F.2d at 1280.

[80] *Id.* at 1280-81.

[81] *Id.* at 1280.

Similar considerations drive this case on the record presented.  Here, a reasonable jury could conclude Plaintiffs applied for housing but were denied the opportunity to rent, inspect, or negotiate for a rental.  For example, Plaintiffs provided evidence that they approached Snow Garden and expressed their intent to secure housing at the Apartments during a specific time period.  Each group of Plaintiffs testified they either applied or intended to apply; in fact, at least two of the students visited Snow Garden on several occasions in an effort to secure housing there.  Similar to *Asbury*, when non-minority students approached Snow Garden with a similar inquiry, Snow Garden responded by providing a soft offer for the same time period.  This suggests that the application process at Snow Garden was more flexible than Snow Garden would be willing to admit in its papers.  For all of these reasons, a reasonable juror could find that Plaintiffs' initial and renewed inquiries, at least under the facts of this case, satisfy the prima facie element of applying for housing insofar as the term was broadly construed by the Tenth Circuit in *Asbury*.

Despite this evidence, Snow Garden insists that judgment should be entered in its favor because neither group of Plaintiffs completed a formal, online application.  The court disagrees for two reasons.  First, as mentioned above, Snow Garden's disparate treatment of Mr. Snyder and his friends suggests that, when it wanted to do so for non-minority students, Snow Garden offered or negotiated housing before an application had been submitted.  In this respect, a reasonable jury could find that Snow Garden intended to use discriminatory hurdles to deny protected groups housing or the opportunity to negotiate for a rental within the meaning of the plain language of § 3604(a).[82]

---

[82] This is especially true where, as here, Plaintiffs produced at least some evidence that housing opportunities remained available.  *See supra* Background, Part C.

Second, the court concludes Snow Garden's formulaic construction of the second prima facie element is not only too restrictive but also inconsistent with the principles underlying the *McDonnell Douglas* burden-shifting framework and the Fair Housing Act.  Specifically, this court has been instructed that the burden of production for a prima facie case is not an onerous one. More importantly, the Supreme Court has cautioned that prima facie elements provide a flexible standard that can vary depending on the facts of each individual case.

Applying these principles to this case, the court concludes that imposing on protected minorities heightened application requirements, like those shown here, constitutes one manner of "refus[ing] to negotiate for the sale or rental of, or otherwise make unavailable or deny" housing in a way that falls within the language of the Fair Housing Act.  Indeed, courts have held the absence of a formal application may not be fatal in similar circumstances because the broad language of the Fair Housing Act suggests that Congress intended it to reach a range of racially motivated conduct.[83]  Finally, while not dispositive, it is worth noting that the conduct alleged here would also appear to constitute a violation under federal regulations.[84]

For all of these reasons, the court declines to adopt Snow Garden's restrictive reading of § 3604(a), and finds that Plaintiffs produced sufficient evidence to establish a prima facie case.

**B.      42 U.S.C. § 3604(b) – Discrimination in the Terms and Conditions of Rental**

Under the Federal Housing Act, it is "unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or

---

[83] Dkt. No. 74, at 6-7; *cf. Fair Hous. Justice Ctr., Inc. v. Silver Beach Gardens Corp.*, No. 10-CIV-912, 2010 WL 3341907, at *6 (S.D.N.Y. Aug. 13, 2010); *Steptoe v. Sav. of Am.*, 800 F. Supp. 1542, 1546 (N.D. Ohio 1992); *United States v. Bankert*, 186 F. Supp. 2d 623, 628 (E.D.N.C. 2000); *S. California Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1151 (C.D. Cal. 2007).

[84] *See* 24 C.F.R. § 100.60(b).

national origin."[85]  Courts have adopted different approaches to articulating the elements of a

claim under § 3604(b).[86]  After reviewing the cases cited in the parties' papers, the court

concludes that a plaintiff asserting such a claim must show:

> (1) he is a member of a statutorily protected class; and (2) he was
> not offered the same terms, conditions or privileges of rental of a
> dwelling or was not provided the same services or facilities in
> connection therewith made available to others under circumstances
> giving rise to a reasonable inference of prohibited discrimination.[87]

In this case, Plaintiffs satisfied their prima facie burden for both elements.  Plaintiffs fall

within a statutorily protected class.  They have also proffered evidence that minority applicants

encountered a more burdensome application process when seeking housing at Snow Garden in

comparison to Caucasian applicants.  Taken in its entirety, the evidence submitted by Plaintiffs

suggests Snow Garden did not require the Caucasian applicants to submit an application and

deposit before providing accurate information about housing availability or offering a specific

apartment for rent.  In this respect, evidence of Snow Garden's disparate treatment of minority

applications gives rise to a reasonable inference of prohibited discrimination.[88]  Moreover, a

reasonable juror could find that the surreptitious recording supports a reasonable inference that

Snow Garden offered preferential treatment or services to non-protected groups.

---

[85] 42 U.S.C. § 3604(b).

[86] The parties do not cite to binding precedent for the prima facie elements of § 3604(b).  In a similar context, the
Supreme Court has instructed lower courts to be flexible, stating "the precise requirements of a prima facie case can
vary depending on the context and were never intended to be rigid, mechanized, or ritualistic."  *Swierkiewicz v.
Sorema N. A.*, 534 U.S. 506, 512 (2002) (internal quotation marks omitted).

[87] *Delkhah v. Moore*, 2006 WL 1320255 (D. Kan. May 15, 2006), *aff'd*, 240 F. App'x 768 (10th Cir. 2007).

[88] *See* 24 C.F.R. § 100.65 (including within list of prohibited actions the failure to process an offer for rental and the
use of different provisions in a lease).

In response, Defendants maintain that all potential renters were required to submit an application before receiving a firm offer from Snow Garden.[89]  Defendants argue any disparate treatment should be attributed to differences in housing configuration requested by each group of students.  But both of these theories appear to go the second prong of the *McDonnell Douglas* framework.  More importantly, these arguments fail to address the fact that Plaintiffs have come forward with evidence that non-minority students were given more preferential "services . . . made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination."  In sum, the court must conclude, at least on the parties' briefing and the record presented, that Plaintiffs satisfied their prima facie burden for a claim arising under § 3604(b).

### C.     42 U.S.C. § 3604(d) – Misrepresentations of Availability of Apartments

The Federal Housing Act makes it "unlawful . . . [t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."[90]  A prima facie claim under § 3604(d) requires a showing that: "(1) plaintiffs are members of a protected class; (2) plaintiffs requested information on the availability of a particular type of apartment; (3) defendants failed or refused to provide truthful information about the availability of such apartments; and (4) white applicants were provided with truthful information."[91]

Snow Garden concedes for the purposes of the pending motions the first, second, and fourth elements have been met, but argues that Plaintiffs cannot meet their prima facie burden

---

[89] *See, e.g.*, Dkt. No. 53, at 8.

[90] 42 U.S.C. § 3604(d).

[91] *Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, No. 96-CV-6234, 2001 WL 1776163, at *6 (E.D.N.Y. Dec. 21, 2001) (applying identical prima facie elements to cases arising under § 3604(b)).

because the students requested different types of housing at different times.[92]  Because each group of students asked about a different time period or number of students, Snow Garden theorizes that it must not have provided the minority students with any inaccurate information.

The court rejects this interpretation of the contested evidence and concludes Plaintiffs submitted sufficient evidence for a reasonable jury to conclude that Snow Garden provided inaccurate rental information to African American and/or Polynesian students.  Even in the absence of Ms. Christensen's statements, Snow Garden's internal documents suggest that housing may have remained available in April 2010 and 2012.[93]  And evidence of Snow Garden's disparate treatment of Caucasian students raises serious questions about the veracity of its statements concerning the availability of housing in 2011.  On the facts of this case, the court cannot conclude that factual disputes over the exact number of students seeking housing or the specific rental periods at issue conclusively demonstrates Snow Garden provided accurate information for the purposes of Plaintiffs' prima facie case.

A reasonable juror could conclude that Snow Garden either failed or intentionally refused to provide truthful information to minority applicants when its manager stated she was 99-percent certain housing was unavailable but then reached out and offered housing to Caucasian students.[94]  In sum, Plaintiffs presented sufficient evidence to satisfy their prima facie burden for the § 3604(d) claim.

**VII.   LEGITIMATE, NONDISCRIMINATORY JUSTIFICATION**

Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff presents prima facie evidence of discrimination, the burden shifts to the defendant to present evidence

---

[92] Dkt. No. 58, at 9-11.

[93] Dkt. No. 46-5, at 27-29.

[94] Notably, Snow Garden admits the Caucasian students received truthful information.  Dkt. No. 50, at 34.

20

that the challenged conduct was supported by "a legitimate, nondiscriminatory reason."[95]  The

Supreme Court characterizes this burden as "one of production, not persuasion; it can involve no

credibility assessment."[96]

Snow Garden believes it articulated two facially nondiscriminatory rationales for the

purported discriminatory activity.[97]  First, Snow Garden maintains that it provided truthful and

accurate information to Plaintiffs.  Under this view, Plaintiffs simply requested housing for too

many students or during unavailable time periods.  Second, Snow Garden asserts that the denial

of housing was caused by the fact that neither the African American Plaintiffs nor Polynesian

Plaintiffs ever submitted a formal application for housing.

The court concludes that Snow Garden's explanations for its conduct satisfy its burden

under the second prong of *McDonnell Douglas*.  Here, Ms. Jensen testified that each renter was

required to fill out an online application, the apartment complex rarely has group housing

available at all times, and accurate information was given to all applicants, who in turn were all

required to complete an online application.  Ms. Jensen also testified that spring was the most

difficult time to predict the amount of available housing, and that at times, group housing was

unavailable.  Finally, Ms. Jensen insisted that housing was unavailable for students during the

summer months.  Setting aside credibility determinations, as this court is instructed to do at this

stage of the proceeding, Snow Garden's evidence supplies a legitimate, nondiscriminatory

explanation why Snow Garden's manager asked the minority students to complete an application

or stated housing was unavailable.  In this respect, Snow Garden has carried its burden of

---

[95] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

[96] *Reeves*, 530 U.S. at 142 (internal quotation marks and citation omitted).

[97] Dkt. No. 73, at 2-5.

showing that it may not have discriminated based on race, imposed different term and conditions

on protected groups, or failed to provide truthful information on the availability of housing.

Because Snow Garden satisfied its burden of production, the only remaining question is

whether Plaintiffs presented sufficient evidence of pretext.[98]

## VIII.   PRETEXT

In the Tenth Circuit, plaintiffs satisfy the pretext hurdle by showing "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons."[99]  In doing so, it is not enough for plaintiffs to rely on mere conjecture.[100]

The court concludes that Plaintiffs proffered sufficient evidence for a reasonable jury to

find that Snow Garden's explanation was unworthy of belief.  Specifically, Plaintiffs submitted

internal documents, which Snow Garden's representative testified reflect the number of spots

available at any given point in time.  These documents suggest that Snow Garden had housing

available when students visited in the spring of 2010 and 2012.  Moreover, there is evidence and

testimony that Snow Garden never completely filled its apartment complex during 2012.[101]  And

the experience of Mr. Snyder and his friends provides an additional basis on which a reasonable

jury might disbelieve Snow Garden's claim of providing truthful information to all applicants.

Finally, although not dispositive of the pretext issue, the court will note that if a reasonable jury

finds that Ms. Jensen once made derogatory comments to a former employee about Polynesian

---

[98] *Reeves*, 530 U.S. at 142.

[99] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted).

[100] *Id.*

[101] *See* Dkt. No. 74, at 4-5 (citing evidence and quoting testimony).

tenants, it could support both a finding of pretext and strong inferences of discriminatory rental practices.[102]

In response, Snow Garden argues that spreadsheets containing references to the number of available apartments do not demonstrate pretext for a number of reasons.  First, Snow Garden avers that the spreadsheets do not show that group housing was available because the spreadsheets only indicate the total number of spots filled.  Second, Snow Garden maintains that there are factual disputes over the time period and housing arrangements requested by Plaintiffs. Third, Snow Garden argues that spring is the most difficult time to determine availability, and that the spreadsheets do not reflect the number of current tenants who would be permitted to stay the following year.  Finally, citing cases from the employment context,[103] Snow Garden argues that a mistaken belief about the availability of apartments would absolve it of liability.

These arguments are unpersuasive.  As a threshold matter, Plaintiffs need not demonstrate that the spreadsheets conclusively prove that housing was available in a particular configuration to satisfy their pretext burden, as Snow Garden appears to suggest.  Instead, the case law requires only that the students point to evidence from which a reasonable jury could conclude that the explanation provided by Snow Garden is unworthy of belief.  Here, Snow Garden's corporate representative testified that the spreadsheet indicated the number of spaces available.  Finally, while it may have been difficult to ascertain available housing during the spring semester, it does not explain why Mr. Snyder and his friends received more information and services, instead of encountering administrative hurdles, when they inquired about housing at Snow Garden.

_____

[102] There was also testimony that Ms. Jensen considered photographs of each applicant.  Dkt. No. 46-5, at 9.

[103] Dkt. No. 73, at 5-6 (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1223-25 (10th Cir. 2000)).

Snow Garden also argues that the experience of the Caucasian students does not show pretext because Mr. Snyder and his friends requested housing for a different number of students and time period.[104]  In *Morgan v. Hilti, Inc.*, the Tenth Circuit observed that disparate treatment of similarly situated employees could weigh in favor of pretext.[105]  Although the issue is hotly contested in this case, a reasonable jury could find substantial similarity between the housing requests described in the affidavits of Mr. Neufi, Mr. Naeta, and Mr. Snyder.  And even assuming there were minor variations in the number of students or particular semester sought, the fact that Snow Garden offered to split up the non-minority students and then called them back a few days later to offer the students their requested housing arrangement raises genuine issues about whether Snow Garden discriminated against minority students.[106]  In sum, the varied treatment of three groups exposes weaknesses, implausibilities, and inconsistencies in Snow Garden's purported explanation for its conduct such that a reasonable jury could find it unworthy of belief.

Finally, Snow Garden argues that its treatment of Plaintiffs can be explained by the absence of a formal application.  In some cases, the complete absence of an application may supply a legitimate, nondiscriminatory explanation which results in summary judgment.  But not in this case.  Here, two claims asserted by Plaintiffs do not depend on or require an application—a party could impose discriminatory hurdles or provide untruth information in a manner that gives rise to liability under § 3064(b) or § 3604(d) before an application is required.[107]  In this respect, the absence of an application does not absolve Snow Garden of liability.  But more importantly, for the reasons already discussed, a reasonable jury could conclude that Snow

---

[104] Dkt. No. 73, at 6-7.

[105] *Morgan*, 108 F.3d at 1324.

[106] *See* Dkt. No. 74, at 3-4.

[107] 42 U.S.C. § 3604(b), (d); *see also* Part VI.

Garden imposed discriminatory hurdles in its application process in an effort to deny housing to minority applicants, because (a) Polynesian and African American students were told that housing was unlikely but that they must pay a fee before submitting their application, (b) rental information provided to minority students referenced a security deposit, while similarly situated non-minority students were not instructed to pay a deposit, and (c) non-minority students were told that housing was available and received a follow-up phone call to encourage their application.  Stated differently, disparate treatment of non-minority students exposes serious weaknesses in Snow Garden's application defense.  Also, while not dispositive of the pretext analysis, the plausibility, consistency, and coherency of Snow Garden's application process is undermined if Ms. Jensen told a former employee that she did not like to rent to Polynesian students.

While Plaintiffs presented sufficient evidence of pretext to survive summary judgment, the court concludes that genuine issues of material fact preclude summary judgment in their favor.  As Snow Garden appropriately argues, numerous issues are disputed.  For example, in part because of inconsistencies between the depositions and affidavits, the specific rental period requested by each group of students remains unclear.[108]  The parties continue to dispute whether Snow Garden offered housing to students during the summer months.  Ms. Jensen's declaration also raises genuine issues of material fact concerning housing availability and the application process.  Finally, the parties contest whether Ms. Jensen informed Ms. Christensen that she would not rent to African American or Polynesian students.

In sum, while both parties satisfied their burdens on the *McDonnell Douglas* framework, the resolution of this dispute will hinge largely on a jury's evaluation of the evidence and the

---

[108] Dkt. No. 58, at 16.

credibility of the witnesses.  A jury should be permitted to test the veracity of statements relating to the availability of housing and consider whether Snow Garden erected discriminatory hurdles in its application process to make unavailable or deny housing to protected groups.  Accordingly, summary judgment is an inappropriate procedural mechanism for resolving this case.

## CONCLUSION

For the reasons stated above, the court **DENIES** Defendants' Motion for Summary Judgment[109] and **DENIES** Plaintiffs' Motion for Partial Summary Judgment.[110]  The parties shall contact the court within ten (10) days of this Order to set a final scheduling conference.

SO ORDERED this 30th day of December, 2014.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[109] Dkt. No. 40.

[110] Dkt. No. 45.